Slip Op. 17 - 3

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JUANCHENG KANGTAI CHEMICAL CO., LTD., | : |
| | : |
| Plaintiff, | : |
| | : |
| ARCH CHEMICALS, INC. A LONZA COMPANY, ARCH CHEMICALS (CHINA) CO., LTD., and HEBEI JIHENG CHEMICAL CO., LTD., | : |
| | : |
| Consolidated Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| CLEARON CORP., and OCCIDENTAL CHEMICAL CORPORATION, | : |
| | : |
| Defendant-Intervenors. | : |

Before:  R. Kenton Musgrave, Senior Judge

Consol. Court No. 14-00056

**OPINION**

[Sustaining redetermination on seventh (2011-2012) administrative review of chlorinated isocyanurates from the People's Republic of China.]

Decided: January 19, 2017

*Gregory S. Menegaz*, *J. Kevin Horgan*, and *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, DC, for the plaintiff.

*Peggy A. Clarke*, Law Offices of Peggy A. Clarke, of Washington, DC, for the consolidated plaintiffs.

*Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant.  On the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of Counsel was *David Richardson*, Senior Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*James R. Cannon, Jr.* and *Ulrika K. Swanson*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for the defendant-intervenors.

Musgrave, Senior Judge:   This opinion addresses the results of remand concerning the seventh (2011-2012) administrative review of chlorinated isocyanurates ("chlor-isos") from the People's Republic of China ("PRC").  Familiarity with prior proceedings[1] is presumed.  The plaintiff Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") and the consolidated plaintiffs Hebei Jiheng Chemical Co., Ltd. ("Jiheng") and Arch Chemicals (China) Co., Ltd. (together, "Arch-Jiheng"), all producers and/or exporters of the subject merchandise from the PRC and respondents at the administrative review, argue for further remand, while the domestic industry representatives, Clearon Corporation and Occidental Chemical Corporation (together, "Clearon"), support the defendant International Trade Administration, U.S. Department of Commerce ("Commerce"), in arguing for sustaining the latter's results of remand as is.  For the following reasons, the remand results must be sustained.

---

[1]  *See Final Results of Redetermination Pursuant to Court Remand*, ECF No. 81-1 (Apr. 15, 2016) ("*Redetermination*" or *"RR"*) regarding *Chlorinated Isocyanurates From the PRC*, 79 Fed. Reg. 4875 (Jan. 30, 2014), and accompanying issues and decision memorandum (Jan. 23, 2014) ("*IDM*"), Public Record Document ("PDoc") 200 (together, "*Final Results*"); *see also Juanchang Kangtai Chemical Co. v. United States*, 39 CIT ___, Slip Op. 15-93 (Aug. 21, 2015) (remanding original final results).  Familiarity with the agency's general methodology for seeking surrogate values for non-market economy ("NME") factors of production ("FOPs") is also presumed, and reference herein to documents in the remand administrative record are preceded by "R".

*Discussion*

On remand, Commerce reconsidered (1) selection of the primary surrogate country, (2) adjustment of the financial ratio calculation to reflect production labor costs, (3) use of ammonium sulfate as a by-product offset, (4) valuation of ammonium chloride, and (5) adjustment of U.S. price to account for the portion of the PRC's value added tax (VAT) that is not refunded upon export. Arch-Jiheng contests issues (3) and (5) and Kangtai contests all five. The first three issues overlap similar issues considered over the course of the sixth administrative review, and Commerce's reasoning in the *Redetermination* on those issues essentially adheres to the reasoning it articulated on the similar issues in the final redetermination of that sixth review. *See Clearon Corp v. United States*, 40 CIT ___, Slip Op. 16-110 (Nov. 23, 2016) ("*Clearon III*"); Clearon Second Remand Results, No. 13-00073, ECF No. 106-1 (Mar. 22, 2016); *see also Clearon Corp. v. United States*, 39 CIT ___, Slip Op. 15-91 (Aug. 20, 2015) ("*Clearon II*") (remanding first remand results) and *Clearon Corp. v. United States*, 38 CIT ___, Slip Op. 14-88 (July 24, 2014) ("*Clearon I*") (remanding original final results).

I.  Selection of Surrogate Country

In its original *Final Results*, Commerce selected the Philippines as the primary surrogate country over Kangtai's objection, in relevant part, that Commerce should instead select Thailand or India. *See IDM*, PDoc 200 at 6-10. Commerce concluded that the Philippines (1) was at a level of economic development comparable to the PRC home country; (2) was a significant producer of comparable merchandise; (3) had "publicly available and reliable data" for important inputs (*i.e.*, FOPs); and (4) was the sole country with contemporaneous surrogate value data for all

FOPs.  *Id*. at 6.   Although Thailand likewise satisfied the first two factors (the economic comparability and significant production prongs), Commerce explained there were no contemporaneous Thai data for at least labor and chlorine, which are two key FOPs.  *Id*. at 7. Commerce also concluded the Philippines presented the best financial statement on the record; because the Philippines financial statement contained specific line items for sales, general, and administrative (SG&A) expenses, enabling the calculation of the surrogate financial ratios, unlike the sole usable statement from Thailand.  *Id*. at 8.  Commerce also rejected Kangtai's proposal to use India, not least[2] because India was not included on the list of countries at a comparable level of economic development to the PRC.  *Id*. at 8, 29.

After judicial review of Kangtai's challenges to Commerce's selection of the Philippines as the primary surrogate country over India and Thailand, Commerce's methodology was sustained in part, but the selection of the Philippines was remanded for reconsideration in light of the possibility of change to certain surrogate values.  *See*, *e.g.*, Slip Op. 15-93 at 22.

## A.

In its remand results, Commerce continued to select the Philippines over Thailand and India as the primary surrogate country.  *Redetermination* at 30-33.

With respect to India versus the Philippines, Commerce adhered to the view that the Philippines was on the surrogate country list of countries comparable to the PRC and India was not.

---

[2]  Commerce also expressed a procedural concern with using Indian data because Kangtai had not submitted Indian data until after the preliminary results. *IDM* at 10. Although this submission was not untimely, it meant that the parties' first opportunity to consider India was at the briefing stage before the final results, so Commerce found that such delayed consideration could "create undue administrative difficulties" and could "be potentially unfair to the parties." *Id.* (internal quotation marks omitted).

Although Commerce relied on Indian data for chlorine, as "the *only* other available information on the record to value the chlorine input,"[3] Commerce considered that the Philippines had "quality" data available for the remaining dozens of inputs. *Redetermination* at 29. Elaborating, although Commerce had indicated chlorine is "key," it stated that "chlorine is not so critical as to warrant switching to India as the primary surrogate country at the expense of quality data for all other factors chosen from a country at the same level of economic development." *Id.* Commerce more fully explained that when it previously "emphasized" the importance of chlorine it did so when considering an all-else-being-equal choice between economically comparable countries, and that by definition "all else is not equal when choosing between a country at the same level of economic development and one that is less comparable." *Id.* Commerce explained that the statutory consideration of "economic comparability" refers to a comparison of countries and not, as Kangtai would prefer, industries, because focusing upon or emphasizing the latter would effectively undermine the plain meaning of 19 U.S.C. §1677b(c)(2)(b). *See id.* at 30. For those reasons, Commerce stated it would not choose a less economically comparable market-economy country as its primary surrogate for the NME country simply because it values one factor accounting for "only a fraction of NV" from such a country (in this instance, the Indian chlorine value on the record). *Id.* at 31.

Regarding its choice of the Philippines over Thailand, Commerce first explained that the record of this proceeding shows no single country that meets the requirements of being at the same level of economic development as the PRC as well as having data for valuing all FOPs in such

---

[3] *Redetermination* at 49 (emphasis in original).

country.  *Redetermination* at 31.  Commerce then stated that it preferred to value FOPs in an economically comparable country rather than relying on valuation data from a less economically comparable country (because data from a less economically comparable country are, by definition, less comparable) as a means of achieving "balance" among its regulations and the statutory directives in selecting surrogate countries.  *Id.* at 31-32 (footnotes omitted).  As none of the potential surrogate countries at the same level of economic development as the PRC contained data to value all of the FOPs, Commerce kept its regulatory preference in mind in determining that it was able to value nearly all of the FOPs in a single economically comparable surrogate country, *i.e.*, the Philippines. *Id.* at 32.

And in passing, Commerce also clarified, again, that it considers "economic comparability" and "significant production of comparable merchandise" to be independent statutory factors, and that a finding regarding one does not imply a finding regarding the other. *Redetermination* at 32. Both "are threshold factors; they are either met or they are not", and "significant" is not measured in comparison to the respondent's own level of production or the scale of the industry in the NME country under investigation:

> [T]he key factor is *support*.  If a country is a significant producer of comparable merchandise, then the economy of the surrogate country is developed enough to *support* an industry in the comparable merchandise.  In other words, a country is a suitable surrogate if it is able to produce comparable merchandise in a similar economic environment, a conclusion reached through examination of economic comparability and, separately, examination of evidence of actual production of comparable merchandise, even though it may be on a much smaller scale than that of the respondents or the NME under examination.  As for matching a respondent's production, the statute requires the Department to use the FOPs of the respondent. It is through this method of normal value calculation that the respondent's production is represented and again nothing about the scale of production is included in the FOPs provision.

*Id.*

The foregoing is consistent with Commerce's approach to surrogate country selection for the subject merchandise as articulated in its second remand results on the previous (*i.e.*, sixth) administrative review of the antidumping duty order.  *See Clearon III*, Slip Op. 16-110.

B.

Kangtai raises two broad arguments, the first of which appears to be directed at Commerce's interpretation of 19 U.S.C. §1677b(c)(4), to wit, that Commerce inappropriately conflated quality of data with economic comparability.  Kangtai also argues Commerce conflated "meaningful consideration" of significant production (with what else, Kangtai does not elaborate) in its analysis of the primary surrogate country.  Kangtai *RR* Cmts at 1-5.  The first argument emanates from Commerce's determination that it could not select India as the surrogate country due to its preference, which is "to value FOPs in an economically comparable country, rather than relying on valuation data from a less economically comparable country[,] because data from a less economically comparable country is, by definition, less comparable".  *Redetermination* at 31-32. The second argument apparently emanates from Commerce's statement that "'[s]ignificant' is not measured in comparison to the respondent's own level of production or the scale of the industry in the NME country investigation."  *Id.* at 32 (brackets added).

Given Commerce's explanations, Kangtai argues that no country that is less economically comparable could possibly have higher quality data because its data are already lower quality by the very nature of that data being sourced from a less economically comparable country,[4]

---

[4]  Additionally, Kangtai complains that Commerce states that the Indian chlorine values are
(continued...)

and that Commerce has effectively equated "significant producer" to mean *any* production and thereby nullified that statutory requirement.  "The statutory scheme does not permit the Department to make economic comparability the exclusive test to define potential surrogate countries at the potential sacrifice of significant production and data quality elements implicated in the pursuit of the 'best available information.'"  Kangtai *RR* Cmts at 5.  The court can agree with that statement, but it does not agree that Kangtai's articulation accurately recounts what Commerce has done here or that it is a logical extension of Commerce's reasoning on the case.

To support its economic comparability argument, Kangtai quotes the second remand order in the sixth administrative review, in relevant part, that data quality may sometimes "outweigh[ ] the fact that a country is not on the surrogate country list."  *Id*. at 1-2, quoting *Clearon II*, Slip Op. 15-91 at 10.  It may indeed.  But, the burden  is on the claimant to persuade Commerce that that is the case.  *See Clearon II* at 10-11.  In the remand results, Commerce found that the Philippines was on the surrogate country list and provided the requisite quality data for all but one of the dozens of factors of production.  *Redetermination* at 29.  In the final analysis, Commerce was simply not persuaded by Kangtai's arguments that Thailand or India were "better" choices for primary surrogate country when considering the quality of their data as against those of the Philippines in the context of statutorily-required economic comparability.  *See*, *e.g.*, *id.* at 48 ("[a]ll else equal, the Department will consider data quality as a 'tiebreaker' when choosing between

---

[4] (...continued)
not superior to the Philippine data but rather that the Philippine import sources cannot be used merely because of chlorine's volatile nature and high international transportation costs, and just "[h]ow the Department reasons that reliable Indian sources are not superior to unusable inferior Philippine data, is a perplexity that Kangtai is unable to decipher."  Kangtai *RR* Cmts at 2-3, referencing *Redetermination* at 49.

multiple countries on the list of economically comparable countries that are significant producers of subject merchandise").

Nor does this case turn on Kangtai's argument that "significance is a term of comparison." *See* Kangtai *RR* Cmts at 4, citing *Fresh Garlic Producers Ass'n v. United States*, 39 CIT ___, 121 F. Supp. 3d 1313 (2015) ("*FGPA*").  In the remand results, Commerce disagreed with the holding in *FGPA* that significant production means production "'having or likely to have influence or effect'" on world trade. *See Redetermination* at 51-52; *see also FGPA*, 39 CIT at ___, 121 F. Supp. 3d at 1338.  Commerce instead  interpreted "significant" to mean "a noticeably or measurably large amount," an interpretation that is entitled to *Chevron* deference.  *See Redetermination* at 52 (citation omitted); *see also Agro Dutch Indus. v. United States*, 508 F.3d 1024, 1029-30 (Fed. Cir. 2007).  Even assuming that significance required an influence on world trade, moreover, Kangtai has not identified any record evidence that the Philippines' production of the comparable merchandise, sodium hypochlorite, was so low that it completely failed to affect world trade.

Commerce's position is that "[t]here are not degrees of significant production" and that it need not select the country that is "the most significant producer" of comparable merchandise. *Redetermination* at 10, 50.  *See* Kangtai *RR* Cmts at 5.  That does not appear improper, as it is consistent with the statutory language requiring "significant producers of comparable merchandise," a phrase that does not require selection of "most significant" producers of such.  *See* 19 U.S.C. §1677b(c)(4)(B). Kangtai, nonetheless, challenges this reasoning by relying, again, on *Ad Hoc Shrimp Action Committee v. United States*, 36 CIT ___, 882 F. Supp. 2d 1366 (2012), which the

context of this case has repeatedly held inapposite to Kangtai's position.  *See*, *e.g.*, Slip Op 15-93 at 12-20; *Clearon I*, Slip Op. 14-88 at 11, 24-30.  There is no perceptible basis for revisiting this issue at this stage in the proceeding, as the remand results simply confirm Commerce's practice of considering "evidence of actual production of comparable merchandise" even if such production "may be on a much smaller scale than that of the respondents or the NME under examination." *See Redetermination*  at 32; *see also id*. at 52 ("[i]n this underlying seventh administrative review of chloro isos from the PRC, we determined that the available data indicated significant production of comparable merchandise in the Philippines and Thailand because the relevant amounts were 'noticeably or measurably large' enough to reasonably assume that the data reflected transactions among buyers and suppliers in normal market conditions").  In other words, consideration of "actual production," so long as it is significant, is not synonymous with "any" production.  *See* Kangtai *RR* Cmts at 4.  The defendant also points out that the facts of the matter at bar are distinguishable from *Shandong Rongxin*,[5] *see id*. at 5, in which Commerce interpreted "significant" as "any country with any level of exports under the relevant [Harmonized Tariff Schedule] subheading", and the court can agree that appears to be the case.

In passing, the court notes Kangtai's observation that Commerce "takes a very broad perspective on one prong of the statute, significant production, and a very narrow perspective on another prong of the statute, economic comparability".[6]  That, however, may simply be a necessary

---

[5]  *Shandong Rongxin Imp. & Exp. Co. v. United States*, 35 CIT ___, ___, 774 F. Supp. 2d 1307, 1315 (2011), *aff'd sub nom. China First Pencil Co. v. United States*, 466 Fed. Appx. 881 (Fed. Cir. 2012) (unpublished).

[6]  Kangtai *RR* Reply at 5, referencing Kangtai *RR* Cmts at 4-5 and, *inter alia*, *Ad Hoc Shrimp* (continued...)

consequence of reality, insofar as there may be numerous countries clustered within a particular GNI

band in any given instance, which is necessarily considered *ad hoc*, while at the same time only few,

if any, that can be concluded "significant" producers of the particular comparable merchandise in

question.  It is not for this court to dictate to Commerce how it is to fulfill its statutory mandate under

such circumstances; there may be instances, of course, where critical data for a country on the OP

List are so obviously flawed that insistence upon selection of that country as the primary surrogate

cannot but be concluded unreasonable, or for example where production of the comparable

merchandise is so insignificant as to be commercially negligible, but in this matter the court is

unpersuaded that this is one of them.[7]  To this point, Kangtai is once again essentially asking the

---

[6] (...continued)
*Trade Action Comm. v. United States*, 36 CIT ___, 882 F. Supp. 2d 1366, 1374 (2012) and *Fresh Garlic Producers Ass'n v. United States*, 40 CIT ___, Slip Op. 16-68 (July 7, 2016) ("Commerce has arbitrarily . . . created a broad test for significant producer and apparently a narrow test for economic comparability").

[7] *See, e.g.*, *Redetermination* at 53 ("the Department considered sodium hypochlorite and calcium hypochlorite production and export data in the context of the statute, the regulations, and relevant legislative history and found that, based on a comparison of the information available on the record, both the Philippines and Thailand were significant producers of comparable merchandise during the POR"), referencing Preliminary Decision Memorandum, PDoc 138 (dated July 2, 2013), at 8-9 ("[t]he Department has production data on sodium hypochlorite, indicateing [*sic*] that the Philippines is a significant producer of sodium hypochlorite[, and t]he Department, therefore, finds that the Philippines is a significant producer of comparable merchandise"). *Cf.* Kangtai *RR* Reply at 4 ("*even the Department* does not regard economic comparability as a strict threshold"), discussing *1-Hydroxyethylidene-1, 1-Diphosphonic Acid From the PRC*, 79 Fed. Reg. 16280 (Mar. 25, 2014) (prelim. rev. results) and *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 79 Fed. Reg, 19053 (Apr. 7, 2014) (final rev. and new ship. results), which were also acknowledged in Slip Op. 15-93 at 14 ("as instances where  Commerce went outside the OP List in its choice of surrogate country, either because none of the OP-listed countries were significant producers of comparable merchandise or because the non-listed country sourced the 'best' information for the primary input").

court to further "weigh in" on the matter, but as previously discussed the court cannot substitute judgment for Commerce's reasonable determinations of fact and conclusions thereon.

## C.

Notwithstanding the foregoing, Kangtai argues Commerce must reconsider the data for Thailand *vis-à-vis* the Philippine data in order to make a proper primary surrogate country selection. Kangtai *RR* Cmts at 6-9. The standard of review, however, compels sustaining Commerce's selection as supported by the record and in accordance with law.

To support its contention, Kangtai emphasizes that the determination to rely on Indian data for chlorine amounts to an admission that the quality of the Philippines' data is now actually "critically different" than as found for the original *Final Results*. Kangtai *RR* Reply at 1. Stressing Commerce's acknowledgment on remand that it had made a primary issue out of the fact that if it selected Thailand as the surrogate country it would have to rely on a value from a country outside of the GNI band for the chlorine input (*i.e.*, India),[8] Kangtai argues that the new determination on remand to rely on the Indian data for chlorine should have triggered a full reevaluation of the initial determination to select the Philippines as the primary surrogate country. *Id*. at 2, citing Def's *RR* Resp. at 7 (citing Kangtai *RR* Cmts at 6-9). Kangtai further argues Commerce's "brand new inapposite position that chlorine was not that important" is "results-oriented flip-flopping" that "cannot [be] countenance[d]". *Id*. at 1, 3.

Data quality is now indeed perceptibly different, in the sense that its focal point is now altered. However, to the extent Kangtai's latter point implies Commerce must be held to its

---

[8] Kangtai *RR* Reply at 1-2, referencing *RR* at 29, *IDM* at 7, and Def's *RR* Resp. at 7-8.

prior conclusion thereon, any "reconsideration" of a particular matter necessarily proceeds *de novo*, from a clean slate or *tabula rasa*, as it would defeat the purpose of reconsideration if an agency were to be shackled to any view, conclusion, or finding as originally expressed on the particular matter remanded.  *See*, *e.g.*, *Catfish Farmers of America v. United States*, 37 CIT ___, Slip Op. 13-63 at 7 (May 23, 2013), *remand results sustained*, 38 CIT ___, Slip Op. 14-149 (Dec. 18, 2014), *aff'd*, 645 Fed. Appx. 1001 (Fed. Cir. 2016) (per curium), *cert. denied*, 137 S.Ct. 373 (2016).  Any remand order that would hamstring an agency on a significant finding that is in fact being remanded would run the risk of being interpreted as results-oriented.  Of course, the *particular* matter encompassed by an order of remand is limited to and by its context; remand for "reconsideration" is not, for example, an invitation to re-argue other matter(s) already settled or to argue additional matter not explicitly or even implicitly encompassed by the ambit of the order of remand.

On remand of this matter, Commerce simply concluded that its perception of the data is not "so different" as to have compelled it to choose Thailand over the Philippines.  The *Redetermination* indicates that Commerce did consider in fact whether the Thai data were superior to the Philippine data, all else being equal, *see*, *e.g.*, *Redetermination* at 49 ("we chose the Philippines as the primary surrogate country over Thailand because the usable Philippine financial statements allowed for direct calculation of surrogate financial ratios, whereas the Thai financial statements did not"), and the court cannot quibble with such reasoning.  Kangtai's arguments do not persuade that such consideration was unreasonable.

D.

Nonetheless, Kangtai stresses in relation to financial statements that since Commerce's practice and precedent in how it weighs the quality of such data is to select the non-distorted financial data when choosing between distorted financial data and non-distorted financial data, and to prefer using multiple financial statements when choosing between such a group and a single financial statement of similar quality, Commerce must follow its practice and find that the Thai record has a higher quality of data, because there is only one Philippine financial statement (MVC company), which Kangtai contends is distorted, and multiple Thai financial statements, which Kangtai implies are of higher quality than the Philippine data.

A court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System Inc.*, 419 U.S. 281, 285 86 (1974). Kangtai's argument here fundamentally rests on Commerce's emphasis on the Siam PVS financial statement as "less detailed", *i.e.*, because the cost of goods sold line item did not contain breakouts for energy and other line items. Kangtai claims this is the only statement for either Thailand or the Philippines that did not generate an allegation of receipt of a countervailable subsidy from any interested party, and Kangtai argues the statement "was still detailed enough to calculate ratios." Kangtai *RR* Reply at 3 n.1. Still, the root of Kangtai's argument here, once again, is that it is effectively asking for substitution of judgment for that of Commerce between the PVS statement and the MVC statement, all else being equal. That would be improper, as it is still not obvious from the record that the former is superior to the latter. *See* Slip Op. 15-93 at 26 (". . . could only lead to the conclusion that the Thai data unequivocally 'bested' the

Philippine data of record"), referencing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951);

*see also Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1326 (Fed. Cir. 2012) (the court's

responsibility under substantial evidence review is not "to re-weigh *de novo* the evidence on close

factual questions") (italics added).  Rather, the inquiry is simply whether "'a reasonable mind might

accept'" that the Philippines is preferable to Thailand.  *Norgren*, 699 F.3d 1317 at 1326, quoting

*Universal Camera*, 340 U.S. at 477.

      Overall, Commerce concluded that "the Philippines had better data quality than

Thailand" that included a financial statement that "allowed for direct calculation of surrogate

financial ratios" *Redetermination* at 49.  Notwithstanding Kangtai's arguments here on Commerce's

reasons for preferring the Philippines over Thailand in the surrogate country selection process, the

*Redetermination*'s articulation of Commerce's reasons therefor is supported by substantial evidence

on the record.  *Cf. id.* at 7-18.  On remand, although Commerce selected Indian data to value

chlorine, Commerce determined that the remaining reasons for preferring Philippine data still

remain. Commerce never "reject[ed] the Philippines . . . on the basis of overall data concerns," *see*

Slip Op 15-93 at 22, but it found that the Philippines data were reliable overall when considering the

dozens of chemical inputs, electricity, labor, overhead, SG&A expenses, and profit. *Redetermination*

at 29.

      At this point, Kangtai's current arguments are inconsistent with the history of this

segment of the proceeding.  *See*, *e.g.*, Kangtai *RR* Cmts at 6 (arguing, for example, that Commerce

selected the Philippines "primarily" because of the chlorine factor of production). As explained

above, Commerce provided numerous reasons for preferring the Philippines, including the absence

of a contemporaneous labor value and inferior financial statements. *IDM* at 7-8.  That preference was not held impermissible, *see* Slip Op. 15-93 at ___, and Kangtai does not dispute that Thailand lacks contemporaneous labor data for the period of review, *see IDM* at 7.  Kangtai's previous arguments regarding economic comparability, significant production, and substituting Philippine data for missing Thai values were found unpersuasive.  *See* Slip Op. 15-93 at 23 ("Kangtai's arguments to this point do not persuade that Commerce's selection of the Philippines over Thailand was erroneous"). Kangtai's remaining arguments all appear to the effect that the court should find that "Thailand, not [the] Philippines, is by far the best primary surrogate country."  *E.g.*, Kangtai *RR* Cmts at 9.  Such arguments essentially ask, once again, for a re-weighing of the evidence, and they have already been considered unpersuasive or rejected.  *See* Slip Op 15-93 at 20-26.  That is, with respect to the argument(s) that the court should intervene to hold that Thailand has more and better quality data, better financial statements and is a more significant producer of comparable merchandise, the court perceives no reason to revisit the prior decision on such argumentation.  *See id.*

## II.  "As-Adjusted" Financial Ratio Calculations

In order to avoid double counting of production labor identified in among the selling, general and administrative (SG&A) expenses of the Mabuhay Vinyl Corporation ("MVC") financial statement used for Commerce's financial ratio calculation, on remand Commerce treated MVC's retirement benefits as applicable to all labor (both to direct labor as part of cost of sales and non-production labor as part of SG&A) and continued to find that the record did not support treating MVC's employee benefits as non-production labor and therefore it included those in their entirety

in the SG&A ratio.  The arguments the parties raise here are essentially the same as those addressed in *Clearon III*, albeit as applied to this seventh administrative review.  The court perceives no reason for reaching a conclusion at odds with that decision, and for that reason, the *Redetermination* will be sustained as to Commerce's adjustment of its financial ratio calculation to reflect labor production costs.

### III.  By-Product Offset

Consistent with its treatment of the respondent's by-product offset claims in the prior sixth administrative review, in the original *Final Results* Commerce announced that it was "continuing" to treat ammonium sulfate as the by-product rather than the ammonia gas and sulfuric acid that Commerce has concluded were the by-products of the first through the fifth administrative reviews.  *See*, *e.g.*, Slip Op. 15-93 at 66-69.  Commerce granted Arch-Jiheng's by-product offset claim, albeit as adjusted for ammonium sulfate, but denied Kangtai's claim due to how the by-product's disposition was treated among Kangtai's books and records.  Consistent with *Clearon II*, Slip Op. 15-91, reconsideration and further explanation was required.  *See* Slip Op. 15-93 at 70-81.

### A.

On remand, in considering the respondents' by-product offset claims Commerce relied on domestic Philippine prices instead of imported prices to value ammonium sulfate.  That revision in the remand results is not challenged here.  The *Redetermination* then repeats, essentially, the explanation given in the second remand results of the sixth administrative review for "adjusting" Commerce's by-products offset methodology.  *See Clearon III*, Slip Op. 16-110 at 27-32.

B.

Kangtai and Arch-Jiheng continue to contest Commerce's determinations as to their respective by-product offset claims for this seventh administrative review.  Kangtai challenges Commerce's denial, while Arch-Jiheng repeats arguments similar to those it made on this issue on the final redetermination of the sixth administrative review.  Also, in response to Commerce's observation that Arch-Jiheng claimed it had "realized commercial value by selling ammonium sulfate", Def's *RR* Resp. at 19, Arch-Jiheng argues Commerce's reasoning is impermissibly *post hoc* and factually incorrect because Jiheng had demonstrated commercial value through its introduction into production, not through the sale of the product produced.  *See* Arch-Jiheng *RR* Reply at 3.  Even after discounting those points, and after considering the remainder of Arch-Jiheng's arguments, the court perceives no reason for reaching a conclusion at odds with that of *Clearon III* on this issue.

Regarding the denial of Kangtai's by-product offset claim, the *Redetermination* again noted (as stated in the *IDM*) that it is against Commerce's established practice to grant a by-product offset "where income from the by-product is not realized by the company (*i.e.*, recorded as revenue in the company's accounting records)", that during verification of Kangtai's questionnaire responses it was observed that Kangtai did not maintain an ammonium sulfate inventory account in its accounting system nor did Kangtai have an established inventory control process for the ammonium sulfate by-product, and that in conjunction with certain business proprietary facts on the record of this proceeding "it is clear that Kangtai has not realized, for purposes of this proceeding, any income from the sale of the ammonium sulfate by-product." *Redetermination* at 24-25 (footnotes omitted).

Kangtai repeats that realizing sales of the by-product is a requirement that it did not have before, and it argues Commerce has failed to answer the concerns expressed in the remand order.  *See*, *e.g.*, Slip Op. 15-93 at 71-72 ("[i]t also remains unclear, in accordance with generally accepted accounting principles governing co- and by-product cost accounting, why a company must 'realize' an actual sale from a downstream by-product before an offset claim pertaining to an intermediary by-product's value that has been generated during the production of subject merchandise will be recognized"). More to the point, Kangtai contends

> [T]here is absolute proof that Kangtai received payment for its disposition of ammonium sulfate and the only discrepancy "hits" or affects an accounting entry for which the Department turns to a surrogate value in any event. So, in this sense, the discrepancy has absolutely no impact on the Department's calculations or the reliability of the calculations because the financial ratios are taken from a surrogate country.

Kangtai *RR* Reply at 13.

This, however, is insufficient to overcome the reason alluded to in the *Redetermination* for denying Kangtai's by-product offset claim,[9] as the necessity of a "turn" to a surrogate value for that by-product only arises upon satisfaction of the requirements of a proper claim therefor.  Commerce determined that Kangtai failed to meet those requirement, and as there does not appear to be unreasonableness in that determination, a different conclusion will not be reached.  The court has also considered the parties reliance arguments on the issue, which are also

---

[9]  To wit:  "For business proprietary reasons discussed in the accompanying analysis memorandum, Kangtai failed to meet the established evidentiary standard regarding realized income for by-products.  The record evidence, which Kangtai cites in support of its claimed by-product offset, is clearly unreliable and only serves to support the Department's decision to deny an offset for ammonium sulfate to Kangtai as the company allegedly receiving payment."  *Redetermination* at 47, referencing R-PDoc 14 at 2.

similar to those considered in *Clearon III*, and for the reasons stated therein finds them here similarly unavailing.

## IV.  Surrogate Value for Ammonium Chloride

In the *Final Results*, Commerce valued the ammonium chloride FOP using Philippine import data after rejecting Kangtai's argument that the Philippine import data were "aberrant". *See IDM*, PDoc 181 at 5, 22-23.

## A.

Due to the fact that the Philippine import quantity of ammonium chloride is 128 times smaller than Kangtai's purchases and that Commerce did not explain why a respondent's individual requirements are not relevant to its analysis of record information, the assumption "that the Philippine import data could possibly reflect . . . the commercial reality of this FOP in this case" was queried for its reasonableness.  Slip Op. 15-93 at 54.

On remand, Commerce states that although "South Africa and Kangtai may import and consume, respectively, more ammonium chloride than is imported into the Philippines," it compared Philippine import data with the quantities exported to South Africa from India, and concluded that the Philippine data were "reliable and consistent, in terms of quantity." *Redetermination* at 55. Commerce thus concluded that ammonium chloride was imported into the Philippines in "commercial quant[ities]," *i.e.*, in competitive commercial transactions. *Id.* Thus, and in view of the preference to value factors of production from a single surrogate country, Commerce continued to use the Philippine data to value ammonium chloride.  *Id.* at 16, citing 19 C.F.R. §351.408(c)(2).

B.

Kangtai challenges that determination, arguing that the Philippine import data are indeed "aberrant" because they reflect a small quantity of imports at a substantially higher per-unit value than large-quantity imports from other countries and do not reflect a commercial quantity of ammonium chloride during the relevant period. Kangtai *RR* Cmts at 13-18.  Kangtai points to Commerce's mention of South Africa importing a mere 6,330 kilograms of ammonium chloride from India and argues that the amount was one of the smallest imports into South Africa (and was still larger than the total import quantity from all countries into the Philippines) and further that South Africa imported 4,555,382 kilograms during the POR, which "certainly does not support the Department's declaration that 5,464 kilograms imported over the course of a year into the primary surrogate country is a commercial quantity."  Kangtai *RR* Reply at 11, referencing Def's *RR* Resp. at 28 and PDoc 158 at Ex. SV-20.

However, the fact that Kangtai can muster a different interpretation of the record does not render Commerce's interpretation thereof unreasonable.  *See Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620 (1966) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence").  Kangtai contends Commerce on remand has contributed nothing from which to assume that the Philippine import data reflect the commercial reality of the ammonium chloride FOP in this case, but Commerce's analysis of "commercial quantities" appears consistent with its practice and applicable law.  The applicable statute only requires Commerce to value inputs "based on the best available information", 19 U.S.C. §1677b(c)(1), a vague term at best, and therefore

"Commerce is granted broad discretion to determine whether information is the best available because the statute does not define the term." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citation omitted).  Although cases have required a surrogate value "as representative of the situation in the NME as is feasible," *see* Kangtai *RR* Cmts at 15, quoting *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999), the "reliable guideposts" of "commercial reality" and "accurate" (or representative) "must be considered against what the antidumping statutory scheme demands." *Nan Ya Plastics v. United States*, 810 F.3d 1333, 1343 (Fed. Cir. 2016).  And in demanding "best available information," the statute nonetheless allows Commerce "broad discretion" in selecting that information from economically comparable countries that are significant producers of the subject merchandise.[10] *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  *See* 19 U.S.C. §1677b(c)(1)&(4).  Here, Commerce discharged its obligation to select the "best available information" by choosing data that it concluded were not aberrational, were from the primary surrogate country, and reflected transactions that were made at commercial quantities.  *See Redetermination* at 12-16. In reviewing that choice, the court's duty "is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Zhejiang DunAn*, 652 F.3d at 1341 (citation omitted).

---

[10]  In such context, the cases Kangtai cites to support its proposition are not persuasive.  *See* Kangtai *RR* Cmts at 14-15, referencing *Calgon Carbon Corp. v. United States*, 40 CIT ___, ___, 145 F. Supp. 3d 1312, 1327 (2016), *Jiaxing Bro. Fastener Co. v. United States*, 38 CIT ___, ___, 961 F. Supp. 2d 1323, 1333 (2014), and *Rhodia, Inc. v. United States*, 25 CIT 1278, 1286, 185 F. Supp. 2d 1343, 1351 (2001)).

To the extent Commerce's choice rests on an interpretation of the governing statute, moreover, Commerce's interpretation must be sustained so long as it is reasonable. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Agro Dutch Industries Ltd. v. United States*, 508 F.3d 1024, 1029-30 (Fed. Cir. 2007). Here, Commerce explained that transactions are made at "commercial quant[ities]" when they "reflect market values", "*i.e.*, competitive commercial transactions, either large or small". *Redetermination* at 55, citing, *e.g.*, *Heavy Forged Hand Tools from China*, 66 Fed. Reg. 48026 (Sep. 17, 2001) (final results and partial rescission), and accompanying I&D Memo at cmt. 11. To the extent Kangtai proposes a different interpretation, the argument does not show that Commerce's interpretation is inconsistent with the statute or otherwise unreasonable. *See Agro Dutch*, 508 F.3d at 1029-30.

Substantial evidence supports Commerce's finding that the 5,464 kilograms of Philippine imports of ammonium chloride reflected competitive commercial transactions. *See Redetermination* at 12-16. Citing the underlying import quantities to the Philippines -- "2,882 KG from the United States and 2,553 KG from Singapore" -- Commerce found that these quantities were "consistent" with finding significant import volume. *Redetermination* at 16. Further, import data suggested "that ammonium chloride is often traded in much smaller quantities." *Id*.; *see also* PDoc 181 at 23. Commerce also found the total import volume of 5,464 kilograms "comparable to the 6,330 KG imported from India to South Africa," which was the only other data on the record from a comparable market economy. *Redetermination* at 16; *see also* PDoc 158 at Exhs. SV-19   SV-21. According to Commerce, these examples indicated that the chemical was commercially traded in quantities smaller than Kangtai's annual consumption and also indicated that Kangtai is incorrect

in assuming that 20,000 kilogram shipments are the norm. *See Redetermination* at 15-16, 55. Commerce further points out that Kangtai's assumption is unsupported by anything in the record stating that ammonium chloride is always or typically shipped in 20,000 kilogram containers. *Cf.* Kangtai *RR* Cmts at 16 (no identified record evidence to support its assumption). A reasonable mind could therefore conclude that 5,464 kilograms represent competitive commercial transactions that are not aberrational. *See Zhejiang DunAn*, 652 F.3d at 1341.

Following remand, Kangtai acknowledges "the difficulties in selecting surrogate values that duplicate the exact experience of a [PRC] exporter" and also that Commerce need not "always match the consumption quantity of the respondent to the import quantity in a surrogate value." Kangtai *RR* Cmts at 15-16. In continuing to challenge Commerce's determination, however, Kangtai conflates the "commercial quantity" criteria with the significant production prong of the statute. *See id*. at 15-16. Kangtai suggests, for example, that the Philippines' import quantity is too low for the Philippines to be "a significant producer of the subject or comparable products". *Id*. at 15-16. However, the administrative determination that the Philippines is a significant producer of comparable merchandise has already been upheld. *See* Slip Op. 15-93 at 16. Kangtai also argues that "there is no reasonable way to find that 5,464 KG . . . is a commercial quantity that could have enabled Kangtai to sustain production", Kangtai *RR* Cmts at 17, but Commerce need not replicate the respondent's experience, *Nation Ford Chem.*, 166 F.3d at 1378, and Commerce's determination that the Philippines does produce significant amounts of comparable merchandise does not appear

unreasonable.  *See Redetermination* at 12, citing *IDM*, PDoc 200 at 6-10.  Accordingly, Kangtai fails

to demonstrate that Commerce's finding is unsupported by substantial evidence or contrary to law.[11]

V.  Adjustment for Irrecoverable VAT

The issue of Commerce's deduction of the amount of "irrecoverable" value added tax

(VAT) from the respondent's export prices was previously remanded voluntarily for further

explanation.  *See Redetermination* at 25-28, 56-59.

A.

Pursuant to the relevant statute, the export price or constructed export price shall be

reduced by any export tax, duty, or other charge imposed on the subject merchandise, with certain

limitations. 19 U.S.C. §1677a(c)(2)(B).  Specifically, Commerce shall deduct:

> [T]he amount, if included in such price, of any export tax, duty, or other charge
> imposed by the exporting country on the exportation of the subject merchandise to
> the United States, other than an export tax, duty, or other charge described in [section
> 1677(6)(C) defining net countervailable subsidies].

*Id*.  Deciding in 2012 due to changed circumstances that this provision applied to certain NMEs,

Commerce listed as an example of an export tax, duty, or other charge "an export tax or VAT that

is not fully refunded upon exportation."  *See Methodological Change for Implementation of Section

772(c)(2)(B) of the Tariff Act of 1930*, 77 Fed. Reg. 36481, 36482 (June 19, 2012).  Commerce

further explained that "the export tax, VAT, duty, or other charge" may often be "a fixed percentage

---

[11]  In passing, noted here is that although Commerce acknowledged that there was no reason to doubt the reliability of the South African data, it opted to adhere to the Philippine data, which it also found reliable given its preference for inputs from the primary surrogate country. *Redetermination* at 14-16, citing 19 C.F.R. §351.408(c)(2).  That preference is a valid exercise of Commerce's discretion and Kangtai has not challenged it.

of the price," in which case Commerce would adjust the export price by the same percentage. *Id*. at 36483.

Because the statute does not define "export tax, duty, or other charge imposed", Commerce receives deference in its interpretation so long as it is reasonable. *See Agro Dutch*, 508 F.3d at 1029-30. Here, Commerce found that "export tax, duty, or other charges" includes "a cost that arises as the result of export sales." *Redetermination* at 27. That interpretation is reasonable and consistent with other cases interpreting the word "charges." *See*., *e.g.*, *Shell Oil Co. v. United States*, 751 F.3d 1282, 1291-92 (Fed. Cir. 2014). In that case, the Federal Circuit interpreted a contract provision regarding "taxes, fees, or charges" to include "costs." *Id*. Likewise here, Commerce properly interpreted "other charge imposed" to include "costs", and irrecoverable VAT is just such a cost. Kangtai argues that "[e]xport tax cannot reasonably mean an import VAT", Kangtai *RR* Cmts at 25, but even assuming that were true, the statute also includes "other charges," which would plainly cover such other charges as VAT.

Further, by requiring the cost to "arise[ ] as the result of export sales," *Redetermination* at 27, Commerce also reasonably interpreted the requirement that the cost be "imposed . . . on the exportation of the subject merchandise to the United States", *see* 19 U.S.C. §1677a(c)(2)(B), meaning a cost that "arises solely from, and is specific to, exports." *Redetermination* at 26. That is a reasonable interpretation of the statute. As Commerce explained, the typical VAT regime imposes VAT on imports, but provides mechanisms for companies to recover those VAT payments, whether they export their merchandise or sell it domestically. *Id*. at 25-26. In such regimes, companies receive a full rebate upon exportation, and, for domestic sales,

recover VAT payments by crediting them "against the VAT collected from customers." *Id*. at 26. The PRC's VAT regime differs from the norm with respect to exports, because companies do not receive a full rebate on their VAT payments. *Id*. at 25-26. In the PRC, "some portion of the input VAT that a company pays on inputs used in the production of exports is not refunded." *Id*.  Because this irrecoverable VAT is a charge imposed only on exports, Commerce reasonably concluded that it is a cost imposed "on the exportation of the subject merchandise". *See* 19 U.S.C. §1677a(c)(2)(B).

## B.

Kangtai and Arch-Jiheng argue that the VAT deduction is contrary to statute. Kangtai *RR* Cmts at 22-26; Arch-Jiheng *RR* Cmts at 10-15.  Kangtai argues that the phrase "imposed . . . on the exportation", 19 U.S.C. §1677a(c)(2)(B), "cannot reasonably mean imposed on importation or acquisition." Kangtai *RR* Cmts at 25.  However, the "irrecoverable" portion of the VAT is perfected by exportation.  The deduction fits within the statutory language, as there does not appear to be any practical difference between a new charge imposed at the time of exportation versus a refund that is withheld at the time of exportation (but which is provided for domestic sales). *See Redetermination* at 26-27. Commerce therefore properly recognized that the latter is a "charge" "imposed" on exportation of the merchandise.  *See id.*; *see also Fushun Jinly Petrochem. Carbon Co. v. United States*, Slip Op. 16-25 at 20-25 (Mar. 23, 2016) (sustaining Commerce's interpretation).

Kangtai also cites to numerous authorities for the proposition that Commerce should not apply section 1677a(c)(2)(B) to antidumping proceedings involving the PRC.  Kangtai *RR* Cmts at 23, 25 (citing *Magnesium Corp. of Am. v. United States*, 166 F.3d 1364, 1370-71 (Fed. Cir. 1999);

*Globe Metallurgical Inc. v. United States*, 35 CIT ___, ___, 781 F. Supp. 2d 1340, 1346-47 (2011). But those cases involve judicial affirmance of Commerce's prior methodology, which has since changed. *Methodological Change*, 77 Fed. Reg. at 36482.  That change alone "presents no separate ground for disregarding [Commerce's] present interpretation." *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (citation omitted). Commerce still receives deference with regard to its reasonable interpretation. *See Fushan Jinly*, Slip Op. 16-25 at 25.

Commerce applied its interpretation to the facts presented in this review.  It found that the "standard VAT levy on the subject merchandise is seventeen percent" and the VAT rebate rate "is nine percent." *Redetermination* at 27.  It determined these rates based on the respondent's submissions regarding the PRC's tax laws and regulations. *See. id*. at 27 n.83 (citing CDoc 64 at Exh. C-6.1; CDoc 51, Section C at 30; CDoc 52 at Exh. C-2).  The difference between the VAT levy and the VAT rebate -- eight percent -- was the amount of irrecoverable VAT. *Id*. at 27-28.  This case presented a situation like the one contemplated in the *Methodological Change*, in which the irrecoverable VAT is "a fixed percentage of the price." 77 Fed. Reg. at 36483.  Commerce properly adjusted the export price "downward by the same percentage." *Id*.

Kangtai and Arch-Jiheng argue that Commerce erred in applying the eight percent deduction as the "irrecoverable" VAT because Commerce has assumed that the comparative value of raw materials and the FOB value of the finished goods are the same.  Kangtai *RR* Reply at 14-15 ("the Department makes unreasonable assumptions that the comparative value of raw materials and the FOB value of the finished goods are the same"); Arch-Jiheng *RR* Cmts at 12-15.  According to Arch-Jiheng, "Commerce cannot merely subtract the 9% refund rate from the 17% tax rate applied

to inputs . . . , because those two rates are percentages of different values." *Id*. at 13. In Arch-Jiheng's view, the 17 percent rate applies only to purchases of the inputs for the subject merchandise, whereas the nine percent rebate applies to the exported subject merchandise. *Id*.

The defendant's response is to note that in Kangtai's submission of the tax information for the record, the relevant PRC regulations present the VAT rate and the VAT refund rate in the same row on the same types of goods. *See* CDoc 52 at Exh. 2. The defendant contends the record does not show that the respondents receive anything less than a 17 percent rebate (through credits) on domestic sales of chlor-isos, and it argues this is important, because the crux of Commerce's "inquiry" is to identify costs that specifically apply to exports and not to domestic sales. Def's *RR* Resp. at 33-34, referencing *Redetermination* at 26-27. Thus, it argues, given record evidence supporting a VAT rate of 17 percent on imported inputs and the lower VAT refund rate of nine percent on exported goods, CDoc 52 at Exh. 2, Commerce reasonably calculated an eight percent rate of irrecoverable VAT based on the value of the exported merchandise. *See id*. at 34, referencing *Redetermination* at 26-28.

Arch-Jiheng replies that it is unclear what this "inquiry" pertains to, because "the only 'cost' that could conceivably be considered to apply to exports would be the actual amount of VAT not refunded." Arch-Jiheng *RR* Reply at 18. But that is precisely so. Arch-Jiheng's hypothetical in its reply comments, of the farmer who sells wheat to a baker for $10, who turns it into bread and sells it to a store for $20, which in turn sells to either a domestic buyer or a foreign buyer for $30 (and assuming a 10% VAT rate and a 5% refund rate for simplicity's sake along the line of transactions), implies that under Commerce's approach Commerce would ultimately deduct $1.50

from the $30 U.S. price (because 10% - 5%    5%, and $30 x 5%    $1.50).  *See id*. at 17-18.  "The

problem", according to Arch-Jiheng, "is that the store has already received $1.50 in refund, leaving

only fifty cents of the $2 VAT it paid unrefunded (or in Commerce terminology 'irrecoverable')."

*Id.* at 18.  And it contends that "Commerce's approach, in all instances, substantially overstates the

amount of 'irrecoverable VAT' in such transactions and would do so, even if the [PRC] government

paid no refund at all."

      The court cannot agree, as Arch-Jeheng's statement of the "problem" appears to be

precisely the one that Commerce's solution is meant to address.  The "irrecoverable" part of the VAT

that is not refunded by the PRC government to the seller must be treated as a government-mandated

"charge" that the seller must seek to recover by means of the price it sets to the foreign buyer.

Because the seller must include that charge in its price to the U.S. buyer, Commerce in essence

concluded that it is a charge "imposed . . . on the exportation of the subject merchandise" and that

accordingly the U.S. Price must be adjusted downward in order to achieve the objective of tax

neutrality.  In other words, Commerce simply appears to have interpreted the whole of the statutory

phrase "imposed . . . on the exportation of the subject merchandise" in the sense of the

"irrecoverable" VAT being "perfected" upon such exportation.  *See Bowman*, *supra*.  And given

*Chevron*, the court is unable to conclude that Commerce has unreasonably interpreted, because

"impose" means "[t]o charge; impute", or "[t]o subject (one) *to* a charge" or "lay as a charge, burden,

tax, duty, obligation, command, penalty, *etc.*" and an "impost" is "[t]hat which is imposed or levied;

a tax, tribute, or duty; esp. a duty or tax that is laid by government on goods imported into the

country", *Webster's New International Dictionary* 1251 (2nd ed., unabridged, 1954), such as the

PRC's VAT that was laid on the inputs embodied in the subject merchandise.  It is inarguable that an "irrecoverable" portion of that VAT still manifestly lay on the embodied inputs on or at the time of the exportation of the subject merchandise.

Lastly with regard the respondents' argument that Commerce has overstated the amount of the "irrecoverable" VAT because they paid the 17% rate with respect to imported inputs and that the 9% refund rate should have been similarly determined with respect to those inputs rather than the finished merchandise, the argument is appealing, but the court has been referred to no information of record that would show that to have been what actually transpired between the respondents and the PRC government in fact, for example a record of actual VAT payment(s) in comparison with actual VAT refund amount(s), or some other such documentation from which could be inferred that the amount rebated was related in fact to the amount of VAT paid on the relevant inputs.  Commerce's conclusion that the amount of the "irrecoverable" VAT is properly determined by reference to the VAT refund rate that pertains to the exported product in accordance with Kangtai's submitted tax information does not appear to be an unreasonable interpretation of the available evidence of record, and therefore the court cannot conclude that Commerce's deduction of that "irrecoverable" amount from the export price was unreasonable on this record.  *See* 19 U.S.C. §1677a(c)(2)(B).  The court has also considered the parties remaining arguments on the issues and finds them unavailing.

*Conclusion*

For the above reasons, judgment will enter sustaining the results of remand.

Dated:  January 19, 2017                          /s/  R. Kenton Musgrave
        New York, New York                        R. Kenton Musgrave, Senior Judge